E-FILED
Tuesday, 11 January, 2022 05:18:57 PM
Clerk, U.S. District Court, ILCD

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

FILED

OCT 2 6 2021

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

|  |  |  |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 21-mj- **7124** |
| 2785 North River Isle Road Momence, Illinois 60954 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached hereto and incorporated by reference.

located in the _____Central_____ District of _____Illinois_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §841(a)(1) | Possession with Intent to Distribute and Distribution of Controlled Substances. |

The application is based on these facts:

See the attached affidavit of Special Agent Benjamin D. Glynn of the Federal Bureau of Investigations, which is filed in support of this application.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**s/BEN GLYNN**

*Applicant's signature*

FBI Special Agent Benjamin D. Glynn

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____electronic mail and telephone_____ *(specify reliable electronic means)*

Date: 10/26/2021

*Judge's signature*

City and state: Urbana, IL

Eric I. Long, United States Magistrate Judge

*Printed name and title*



OCT **2 6** 2021

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

IN THE MATTER OF THE SEARCH OF:

2785 North River Isle Road
Momence, Illinois 60954

Case No. ____21- MJ- 7124____

**FILED UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Benjamin D. Glynn, being first duly sworn, hereby depose and state as

follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the premises known as

2785 North River Isle Road, Momence, Illinois 60954 (hereinafter "**Subject**

**Premises**") further described in Attachment A, for the things described in

Attachment B.

2.     I am a Special Agent with the United States Federal Bureau of

Investigation ("FBI") and have been so employed since January 2017. I am an

"investigative or law enforcement officer" within the meaning of Section 2510(7) of

Title 18, United States Code; that is, an officer of the United States who is empowered

by law to conduct investigations of, and to make arrests for, offenses enumerated in

Title 18, United States Code, Section 2516.  I am currently assigned to the St. Joseph

Resident Agency in the FBI's Detroit Division located in the Western District of

Michigan judicial district. Prior to employment with the FBI, I was employed with the Rock Hill Police Department, in the State of South Carolina, for approximately six years. While employed with the Rock Hill Police Department, I was assigned as an Investigator to the Rock Hill Violent Crimes Unit and also assigned to Homeland Security Investigations as a Task Force Officer ("TFO"). During my time as an Investigator, Task Force Officer and Special Agent, I have participated in investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillance; the execution of search warrants; debriefings of informants; and reviews of taped conversations and drug records.

3.    Through my training, education and experience I have become familiar with the way illegal drugs are transported, stored, and distributed; the methods of payment for such drugs; the laundering of illegal drug proceeds; and the dialect, lingo, and coded language used by drug traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money

2

laundering, conspiracy to do the same, and attempts to do the same, in violation of Title 18, United State Code, Sections §§ 1956 and 1957.

4.     Since this affidavit is being submitted for the limited purpose of securing authorization the requested warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that agents and officers believe necessary to establish probable cause to search **Subject Premises**.

5.     To the extent that I use quoted language in this Affidavit from recorded telephone conversations, these quotes are taken from careful review of the conversations by me or other law enforcement officials who have reviewed the conversations. Some communications were also in Spanish and have been translated into English.  These quotes are still in draft format and are not intended to be final transcripts, translations, or quotations. At various points in the Affidavit, I have included my interpretation of words and phrases used in the recorded conversations. My interpretations are based on the content and context of the recorded conversations; events that took place before and after the conversations; my knowledge of the investigation as a whole; my experience and training; and the experience and training of other law enforcement agents in this investigation.

## PROBABLE CAUSE

I.     Background of the Investigation

6.     Since August 2020, the FBI, the Drug Enforcement Administration ("DEA"), and Michigan State Police ("MSP") Southwest Enforcement Team ("SWET")

have been conducting a joint investigation into Ivan HERNANDEZ.  Though the investigation into HERNANDEZ began in 2020, the investigation previously originated with FBI Chicago into HERNANDEZ's then Chicago-based source of supply.  HERNANDEZ resides in New Buffalo, Michigan from where he coordinates his own cocaine drug trafficking organization (DTO).

7.    After months of investigation into the DTO, law enforcement in the Western District of Michigan obtained three orders for authorization to intercept wire and electronic communications from three devices used by HERNANDEZ during the following periods:

a. From August 24, 2021 to September 22, 2021 at 11:59 P.M., pursuant to the August 24, 2021 order entered by the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan (the "First Interception Order") authorizing the initial interception, for a 30-day period, of wire communications occurring to and from a cellular telephone assigned telephone number (269) 426-1021 used by IVAN HUERTA HERNANDEZ, with service provided by AT&T (hereinafter referred to as "Target Phone 1") and wire and electronic communications of the Interceptees occurring to and from a cellular telephone assigned telephone number (214) 662-1935, a prepaid TracFone cellular phone, with no subscriber name or address, also used by IVAN HUERTA HERNANDEZ, with service provided by Verizon

4

(hereinafter referred to as "Target Phone 2," collectively with Target Phone 1, the Target Phones);

b. September 22, 2021 to October 21, 2021 at 11:59 P.M., pursuant to the September 22, 2021 order entered by the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan (the "Second Interception Order") authorizing the continued interception, for a 30-day period, of wire communications occurring to and from Target Phone 1 and of wire and electronic communications occurring to and from Target Phone 2.

c. October 20, 2021 to November 18, 2021 at 11:59 P.M. pursuant to the October 20, 2021 order entered by the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan (the "Third Interception Order") authorizing the initial interception, for a 30-day period, of wire and electronic communications occurring to and from a cellular telephone assigned telephone number (219) 928-3617, a prepaid TracFone cellular phone, with no subscriber name or address, also used by IVAN HUERTA HERNANDEZ, with service provided by Verizon ("Target Phone 3" collectively with Target Phone 1 and Target Phone 2, the "Target Phones").

8.    During the interception periods, investigators identified **Subject Premises** as a residence associated with HERNANDEZ's supplier, ADRIAN ROMERO ANTUNEZ, and his associate, VICENTE PEREZ ROJAS. Among other

evidence associating **Subject Premises** with drug trafficking, on September 28, 2021, HERNANDEZ delivered $20,000 to ROMERO ANTUNEZ, which was then transported by ROMERO ANTUNEZ and PEREZ ROJAS in a white GMC Yukon to **Subject Premises**.   **Subject Premises** is also the location where ROMERO ANTUNEZ's TextNow account with the call number (702) 969-0342, which has been used in furtherance of the drug trafficking, was created and accessed on many occasions from September 2021 to October 2021.

II.   <u>VICENTE PEREZ ROJAS and **Subject Premises**</u>

9.     Based on physical surveillance, search warrant returns, and intercepted communications, I believe VICENTE PEREZ ROJAS, who resides at **Subject Premises**, works in concert with HERNANDEZ's source of supply, ADRIAN ROMERO ANTUNEZ. PEREZ ROJAS was previously charged by the DEA in 2015 for possession of a kilogram of cocaine. That charge was later dismissed. He was also involved in a seven-kilogram heroin distribution investigation by the DEA in 2018. Finally, he was arrested during for his involvement in a DEA cocaine trafficking investigation in October 2020.

10.     Investigators learned of PEREZ ROJAS' role in the drug trafficking conspiracy in trying to determine the user of a TextNow account, (702) 969-0342. After multiple intercepted communications, which will be discussed below, it became apparent that the user of the TextNow account (702) 969-0342 was supplying HERNANDEZ with kilograms of cocaine.  Investigators originally believed PEREZ ROJAS was the user of this TextNow account.  But physical surveillance and further

investigation revealed that ROMERO ANTUNEZ was the user of the phone and was working in concert with PEREZ ROJAS.

11.     On September 8, 2021, a subpoena was issued to TextNow seeking subscriber information, call detail records, and IP address records for (702) 969-0342. The call detail records indicated (702) 969-0342 had only been in contact with five phone numbers, including HERNANDEZ's Target Phone 2. Of these five phone numbers, three were Mexican phone numbers, one was a Los Angeles, CA area code and one was a Chicago, IL area code. The IP address records revealed that the TextNow account (702) 969-0342 had accessed IP addresses provided by internet service providers Viasat, a satellite internet service provider, and Verizon.

12.     On September 8, 2021, a subpoena was issued to Viasat seeking subscriber information and additional IP address records for the specific IP address used to register TextNow account (702) 969-0342. The response received revealed the account holder for that IP Address to be "Vicente Perez" with a service address of **Subject Premises** and a phone number of (773) 848-0398.[1] The type of service was

---

[1] On September 16, 2021, a subpoena was issued to Verizon seeking subscriber for (773) 848-0398. The response received indicated that number was subscribed to Angelica CALDERON residing at 711 E. Broadway Street in Bradley, IL. Open-source research produced a birth announcement from the Kankakee Daily Journal stating Vicente PEREZ and Angelica CALDERON of Momence, IL had a baby boy, their first child, on December 30, 2020. Open-source research also associates (773) 848-0398 with a SnapChat account in the username "chenteperez," and display name "Vicente Perez." VICENTE PEREZ ROJAS also sent $950 to someone in La Huacana, Mexico in his full name, VICENTE PEREZ ROJAS, using (773) 848-0398, on July 25, 2021. During a DEA Chicago Title III investigation, VICENTE PEREZ ROJAS, using (773) 848-0398, was intercepted on three occasions on August 4, 2021. On that date,

fixed satellite internet service, meaning the internet service was accessed from **Subject Premises**.[2]

III.  ROMERO ANTUNEZ Supplies HERNANDEZ with Five Kilograms of Cocaine

13.  During the wire, investigators intercepted HERNANDEZ communicating with a source of supply out of Illinois who used the TextNow phone number (702) 969-0342 and was ultimately identified as ADRIAN ROMERO ANTUNEZ.[3] HERNANDEZ's relationship with the source of supply was facilitated by a male subject believed to reside in Mexico using Mexican telephone number 524251030521, identified as CARLOS with a last name unknown ("CARLOS LNU").

14.  After intercepting communications between HERNANDEZ and CARLOS LNU and HERNANDEZ and ROMERO ANTUNEZ at his TextNow number (702) 969-0342, law enforcement obtained a search warrant for information relating to the TextNow phone number. *See In the Matter of the Search of information associated with TextNow Number (702) 969-0342,* No. 1:21-mj-489 (W.D. Mich.

PEREZ ROJAS communicated with DEA Chicago's monitored subject, Marco AGUINIGA, using (708) 439-9685, to coordinate a meeting with AGUINIGA at his tire shop, where AGUINIGA was supplying kilogram levels of cocaine, heroin, and fentanyl.

[2] Lexis Nexis database Accurint associates Angelica CALDERON and Vicente PEREZ ROJAS with **Subject Premises** since January 2021. Additionally, Vicente PEREZ ROJAS's 2004 GMC Yukon is registered in his name at that address.

[3] On May 5, 2021, DEA Chicago arrested ADRIAN ROMERO ANTUNEZ during a Greyhound bus station interdiction. ROMERO ANTUNEZ had $95,000 in U.S. currency in his possession, which was seized. ROMERO ANTUNEZ and his Mexican passport were photographed by the DEA during this encounter.

September 14, 2021).  Among the information provided by TextNow was historical text message information between HERNANDEZ and ROMERO ANTUNEZ.

15.     On August 23, 2021, HERNANDEZ, using Target Phone 2, and ROMERO ANTUNEZ, using (702) 969-0342, had a text message conversation, some of which is provided below.  The communications were originally in Spanish and have been translated to English:

| | |
|---|---|
| ROMERO ANTUNEZ: | I'll send it to you later.  Just confirm that it's a done deal please. |
| ROMERO ANTUNEZ: | The earliest that you can, please.  Thanks.  I'll see you later. |
| HERNANDEZ: | Well, I finished my work.  I'm just going home to take a bath, and then I can go.  Or, I can wait until you confirm. |
| ROMERO ANTUNEZ: | I'll be around close by.  Let me know when you're coming. |
| HERNANDEZ: | Ok |
| HERNANDEZ: | I'm on my way over, man. |
| ROMERO ANTUNEZ: | Fine.  How long will it take you? |
| HERNANDEZ: | Well, I don't even know where I'm going.  Man, it takes me one and a half hours to get to the city from my house. |
| ROMERO ANTUNEZ: | Did you put in the zip code I sent you? |
| ROMERO ANTUNEZ: | 1837 Irving park Road. Schaumburg 60193 |
| HERNANDEZ: | Fuck that's far. |

9

*       *       *       *       *

| | |
|---|---|
| HERNANDEZ: | I'm with my family. |
| ROMERO ANTUNEZ: | That's fine. I'm with my family also. |
| HERNANDEZ: | That's fine. |
| ROMERO ANTUNEZ: | I'll see you here.  1105 E.Nerge Rd. 60007. How much longer, more or less? |
| HERNANDEZ: | 20 minutes. |
| HERNANDEZ: | It says it's 17 more minutes to this address. |
| HERNANDEZ: | Then I'll see you at this last address you sent me. |
| ROMERO ANTUNEZ: | Yes, we'll meet there. |
| HERNANDEZ: | Ok |
| HERNANDEZ: | I'll be there in five. |

12.   Based on my training, experience, and familiarity with the investigation, I believe these communications show ROMERO ANTUNEZ arranging a delivery of cocaine to HERNANDEZ.  When ROMERO ANTUNEZ texted, "just confirm that it's a done deal," I believe he wanted HERNANDEZ to confirm that he planned to go forward with the cocaine transaction.  When ROMERO ANTUNEZ provided addresses in the western suburbs of Chicago, I believe he was providing HERNANDEZ addresses for them to meet up to complete the cocaine transaction. Both HERNANDEZ and ROMERO ANTUNEZ stated that they were with their respective families.  Based on my familiarity with the investigation, I know that

10

HERNANDEZ and other drug traffickers sometime travel with their partners and children to minimize the risk of law enforcement detection.

13.    Phone location information for Target Phone 1 and GPS tracking information for his 2009 Toyota Camry confirmed that on August 23, 2021, at approximately 3:12 p.m., HERNANDEZ departed his New Buffalo, Michigan residence and traveled to the area of the meeting location provided by ROMERO ANTUNEZ.  Phone location information confirm HERNANDEZ arrived in that area at approximately 5:00 p.m.  At approximately 8:22 p.m., phone location information and pole camera surveillance showed that HERNANDEZ arrived back at his New Buffalo, Michigan home.

13.    According to TextNow records, at approximately 8:41 PM on August 23, 2021, HERNANDEZ, using Target Phone 2, called ROMERO ANTUNEZ at (702) 969-0342, but ROMERO ANTUNEZ missed the call.  This call occurred approximately 20 minutes after HERNANDEZ arrived home in New Buffalo, Michigan.  ROMERO ANTUNEZ and HERNANDEZ then had a text message conversation, some of which is provided below.  The communications were originally in Spanish and have been translated to English:

| | |
|---|---|
| ROMERO ANTUNEZ: | Good evening.  I just got to the house and my phone is dead.  Is everything alright? |
| HERNANDEZ: | Oh, that's fine man.  Yes, everything is fine. |

11

| | |
|---|---|
| HERNANDEZ: | I just wanted to ask you if everything is alright because those five are a different brand. |
| ROMERO ANTUNEZ: | Good morning.  That's how they get here, but all of them are from the same place. |
| ROMERO ANTUNEZ: | The quality is the same. |
| HERNANDEZ: | Okay, man. |

14.    Based on my training, experience, and familiarity with the investigation, I believe that HERNANDEZ had arrived back to his residence in New Buffalo, Michigan and examined the cocaine purchased.  When he said, "I just wanted to ask you if everything is alright because those five are a different brand," I believe he meant that the "five," kilograms of cocaine had a different stamp on the brick than previous deliveries of cocaine.  My belief that the "five" referred to kilograms of cocaine is further corroborated by intercepted communications during the wire, which show HERNANDEZ delivering tens of thousands of dollars of bulk cash to ROMERO ANTUNEZ, which is consistent with the purchase of five kilograms of cocaine. Further, I know that cocaine is typically not branded or stamped other than at the kilogram level.  Finally, when ROMERO ANTUNEZ said, "all of them are from the same place" and "[t]he quality is the same," I believe he was telling HERNANDEZ that the quality of cocaine was the same as prior deliveries despite the difference in branding.

IV.    HERNANDEZ Arranges Payment to ROMERO ANTUNEZ for Previously
      Acquired Cocaine

15.    After taking delivery of the five kilograms of cocaine, multiple

intercepted communications between HERNANDEZ and CARLOS LNU and

HERNANDEZ and ROMERO ANTUNEZ indicated that HERNANDEZ was going to

make a payment of $50,000 to ROMERO ANTUNEZ.[4]

16.    On September 19, 2021, investigators initiated physical surveillance on

HERNANDEZ's residence. At approximately 10:52 a.m., HERNANDEZ departed in

a dark blue 2004 Porsche Cayenne and arrived in Summit, Illinois.  HERNANDEZ

eventually drove into the alley between 62nd Street and 62nd Place. While in the alley,

HERNANDEZ parked behind 7238 62nd Place Summit, Illinois 60501, which was

captured by aerial surveillance.[5]  Upon HERNANDEZ's arrival, a short heavy-set

_____

[4] For example, on September 19, 2021, at approximately 9:46 a.m., HERNANDEZ,
using Target Phone 1, had a telephone conversation (Session 995) with CARLOS
LNU, which was originally in Spanish and translated to English.  CARLOS LNU
asked HERNANDEZ, "You're taking, you're taking the paper for one and a half,
right?"   HERNANDEZ responded, "I'm taking fifty."   Based on my training,
experience, and knowledge of the investigation, I believe CARLOS LNU asked
HERNANDEZ if he was bringing the money ("paper") to pay for "one and a half,"
which I believe to be kilograms of cocaine. HERNANDEZ replied that he would be
bring "50," or $50,000 (fifty), slightly more than the cost of one and a half kilograms
of cocaine.
[5] 7238 62nd Place is the residence of Hector BUSTOS GARCIA, a drug-trafficking
associate of both ROMERO ANTUNEZ and PEREZ ROJAS. In February 2018,
BUSTOS GARCIA delivered 7 kilograms of heroin, in concert with PEREZ ROJAS,
to JUAN CARLOS GUERRERO ROJAS. GUERRERO ROJAS was subsequently
traffic stopped and arrested by the DEA Chicago after receiving the heroin from
BUSTOS GARCIA, who met with PEREZ ROJAS immediately after delivering the
heroin. The historical TextNow messaging contained drug trafficking content

male, believed to be ROMERO ANTUNEZ, walked out of the garage in the backyard of 7238 62nd Place, took a bag from HERNANDEZ, and walked back toward the residence and out of sight of aerial surveillance.  Based on my training, experience, and familiarity with the investigation, I believe HERNANDEZ delivered $50,000 to ROMERO ANTUNEZ, which I believe was payment for past cocaine distributed by ROMERO ANTUNEZ.

17.    On September 27, 2021, at approximately 9:41 a.m., HERNANDEZ, using Target Phone 2, exchanged several text messages with ADRIAN ROMERO ANTUNEZ, using (702) 969-0342.  At approximately 9:44 a.m., HERNANDEZ texted ROMERO ANTUNEZ (Session 834) (which was originally in Spanish and translated to English) "Hey, maybe I can see you tomorrow so I can take some papers to you." The parties then discussed meeting up halfway between Illinois and New Buffalo.  At approximately 6:37 p.m., HERNANDEZ texted ROMERO ANTUNEZ (Session 860) with an address of a shopping center in Merrillville, Indiana.   Based on my training, experience, and familiarity with the investigation, I believe HERNANDEZ and ROMERO ANTUNEZ were setting a meeting place for HERNANDEZ to deliver "papers" (money) to ROMERO ANTUNEZ as payment for prior drugs.

18.    On September 28, 2021, between approximately 9:41 AM and 1:05 PM. HERNANDEZ, using Target Phone 2, and ROMERO ANTUNEZ, using (702) 969-

_____

between ROMERO ANTUNEZ, using (702) 969-0342, and BUSTOS GARCIA, using (469) 581-0409.

0342, had the following text message conversation, which was originally in Spanish and translated to English:

| | |
|---|---|
| ROMERO ANTUNEZ (Session 883): | The thing is that what you are going to give me, I have to send— |
| ROMERO ANTUNEZ (Session 884): | --to Kankakee so they can get it ready with the rest and from here I have to— |
| ROMERO ANTUNEZ (Session 885): | --to go to Chicago. |

      *              *              *              *

| | |
|---|---|
| ROMERO ANTUNEZ (Session 890): | I'll see you there where you said in Merrillville |
| ROMERO ANTUNEZ (Session 891): | Just tell me at what time. |
| HERNANDEZ (Session 892): | How about at 12 noon, at the address that I sent you. |
| ROMERO ANTUNEZ (Session 896): | Okay. |
| ROMERO ANTUNEZ (Session 897): | See you there. |
| ROMERO ANTUNEZ (Session 898): | What's there?? |
| HERNANDEZ (Session 900): | A hotel. |
| ROMERO ANTUNEZ (Session 902): | Okay. I'll see you there. |

      *              *              *              *

| | |
|---|---|
| ROMERO ANTUNEZ (Session 916): | I'm close by to where you told me. There's a TJ Maxx. I'll see you here. I'm already here. |
| HERNANDEZ (Session 917): | Okay. |
| HERNANDEZ (Session 918): | What are you in? |
| ROMERO ANTUNEZ (Session 919): | The Suburban from the last time. |
| HERNANDEZ (Session 920): | Ah, okay. |

HERNANDEZ (Session 921):  Which of the two could it be because there are two here?

ROMERO ANTUNEZ (Session 922): There's a Petland next to it.

19. Based on my training, experience, and knowledge of the investigation, I believe HERNANDEZ was communicating with ROMERO ANTUNEZ regarding meeting at the T.J. Maxx in Merrillville, IN to pay for cocaine previously acquired from ROMERO ANTUNEZ, which, based on other intercepted communications described below, I believe to be $20,000.

20. This belief was corroborated by physical surveillance when, on September 28 at approximately 12:10 p.m., HERNANDEZ departed his New Buffalo, Michigan residence in his silver 2009 Toyota Camry and traveled toward Merrillville, IN. At approximately 1:05 p.m., HERNANDEZ arrived at the TJ Maxx located at 1684 E 80th Avenue, Merrillville, IN. Investigators observed ROMERO ANTUNEZ exit the TJ Maxx store and walk directly to HERNANDEZ's Camry at approximately 1:06 p.m. Surveillance video acquired from TJ Maxx showed ROMERO ANTUNEZ walking toward the store exit while manipulating his cell phone as if typing a text message. ROMERO ANTUNEZ was shown using his phone at about the same time as the text message HERNANDEZ received from ROMERO ANTUNEZ on Target

Phone 2 at 1:05:57 EST (Session 992). This further confirmed that ROMERO ANTUNEZ is the user of (702) 969-0342.[6]

21. ROMERO ANTUNEZ entered the front passenger seat of the Camry. After approximately one minute, ROMERO ANTUNEZ exited the Camry and walked back into TJ Maxx. Approximately three minutes later, ROMERO ANTUNEZ exited TJ Maxx and again walked directly to HERNANDEZ in the Camry. At approximately 1:14 p.m., ROMERO ANTUNEZ exited the Camry holding a brown paper bag he did not previously have. ROMERO ANTUNEZ then proceeded to walk to a white 2004 GMC Yukon bearing Illinois license plate CD29033, registered to VICENTE PEREZ ROJAS at **Subject Premises**, parked near HERNANDEZ's Camry, which is pictured below:

_____

[6] Investigators compared the photographs taken by the DEA of ROMERO ANTUNEZ on May 5, 2021 with those taken on surveillance on September 28, 2021 and confirmed it was the same individual. In fact, ROMERO ANTUNEZ wore the same baseball hat during both his encounter with the DEA on May 5 and his meeting with HERNANDEZ on September 28.



22.    ROMERO ANTUNEZ entered the front passenger seat of the Yukon.
After approximately 30 seconds, ROMERO ANTUNEZ exited the Yukon no longer
holding the brown paper bag and walked back into TJ Maxx.  As ROMERO
ANTUNEZ re-entered the TJ Maxx, HERNANDEZ exited the parking lot in his 2009
Camry and returned to his New Buffalo, Michigan residence.  At approximately 2:14
p.m., VICENTE PEREZ ROJAS, who resides in **Subject Premises**, exited the TJ
Maxx and went to the Yukon.  Approximately 18 minutes later, ROMERO ANTUNEZ
also returned to the Yukon and entered the back passenger seat after meeting with
PEREZ ROJAS at the rear hatch, which is pictured below:

18



Investigators continued to maintain physical surveillance on the Yukon which, with all original occupants, turned onto North River Isle Road from Illinois 114 in Momence, IL at approximately 4:50 p.m. towards **Subject Premises**. As can be seen by the map below, **Subject Premises** is located towards the north end of North River Isle Road. North River Isle Road dead-ends in residential streets north of Illinois 114, including the street where **Subject Premises** is located, the direction that PEREZ ROJAS' Yukon turned from the highway.

19



Based on my training, experience, and familiarity with the investigation, I believe PEREZ ROJAS and ROMERO ANTUNEZ drove to **Subject Premises** after the September 28, 2021 money delivery. I further believe that **Subject Premises** is used to store bulk U.S. currency, including the September 28, 2021 money that HERNANDEZ delivered to PEREZ ROJAS.

23.   On September 28, 2021, at approximately 4:37 p.m., IVAN HERNANDEZ, using Target Phone 1, had a conversation (Session 1229) with CARLOS LNU, using telephone number 524251030521. The following is an excerpt of the call, which was originally in Spanish and translated to English:

HERNANDEZ:    --to-to let you know that I took 20 more to that dude. I don't know if they already told you.

CARLOS LNU:   Yeah. No, they hadn't told me but that's fine

HERNANDEZ:    Yeah, I already, I already left them there, there.

CARLOS LNU:   Yeah, That's fine, that's fine because… You still have a ways to go to get it all out, right?

HERNANDEZ:    20 to go, 20, there's only 20 to go.

    \*        \*        \*        \*

HERNANDEZ:    --I'm going to get them out there little by little. Ball by ball.

CARLOS LNU:   Yeah

24.     Based on my training, experience, and knowledge of the investigation, I believe HERNANDEZ was telling CARLOS LNU he paid $20,000 to ROMERO ANTUNEZ for kilograms of cocaine HERNANDEZ received from ROMERO ANTUNEZ. Additionally, HERNANDEZ confirmed that he still owed ROMERO ANTUNEZ another $20,000.

25.     On October 18, 2021, at approximately 3:40 p.m., pole camera surveillance and vehicle GPS tracking information showed HERNANDEZ leave his residence in New Buffalo, Michigan and travel to Chicago, Illinois. When he arrived, HERNANDEZ parked his Camry on the northwest corner of W. 55th Street and S. California Avenue, facing west. Shortly after arriving at that corner, at approximately 5:02 p.m., HERNANDEZ, using Target Phone 3, placed an outgoing call to Adrian ROMERO ANTUNEZ, using (702) 969-0342. When HERNANDEZ initially arrived at that corner, he was observed to not have any passengers inside

the Camry. After approximately six minutes, HERNANDEZ departed from that corner and traveled directly to 2854 W. 57th Street. HERNANDEZ parked in front of that residence and ROMERO ANTUNEZ was observed exiting the front passenger seat with a green colored grocery bag. ROMERO ANTUNEZ entered the east side gate to enter into the side of the property for 2854 W. 57th Street. HERNANDEZ departed and returned to his New Buffalo residence.

26.     At approximately 5:52 p.m., a white 2004 GMC Yukon bearing Illinois license plate CD29033, registered to PEREZ ROJAS at **Subject Premises**, and the same GMC Yukon driven by Vicente PEREZ ROJAS, parked in front of 2854 W. 57th Street. PEREZ ROJAS stayed for approximately one minute, then drove around the block and once again parked in front of 2854 W. 57th Street. Then, ROMERO ANTUNEZ, rolling a purple luggage suitcase, exited the east side gate of 2854 W. 57th Street and entered the rear passenger seat of PEREZ ROJAS' Yukon, which is pictured below:



27.     PEREZ ROJAS then drove to New Lavanderia Laundromat, located at 5820 S. Kedzie Avenue. ROMERO ANTUNEZ exited the Yukon and entered the laundromat with the suitcase. PEREZ ROJAS departed southbound on Kedzie Avenue.  At approximately 7:25 p.m., ROMERO ANTUNEZ exited the laundromat with the suitcase and walked back toward 2854 W. 57th Street.

28.    Later that evening, law enforcement intercepted a telephone conversation between HERNANDEZ, using Target Phone 1, and CARLOS LNU, using 524251030521 (Session 2175), at approximately 8:48 PM. The following is an excerpt of the call, which was originally in Spanish and translated to English:

| | |
|---|---|
| CARLOS LNU: | The one you gave the papers to? Did you call him again? |
| HERNANDEZ: | No, no, I didn't. |
| CARLOS LNU: | Oh, well, this dude [PH] over here called me and it seems that . . . that, the guy took him, that he gave him a ride. |

HERNANDEZ:      Uh-huh.

CARLOS LNU:     And that, that . . . Well, it seems that, like they saw that
                there were some trucks following them there on the road.

HERNANDEZ:      Uh-huh.

CARLOS LNU:     And that he left him at a, a shopping center. And he says
                that he's calling him and he's not answering.

HERNANDEZ:      Hmm. That's strange.

CARLOS LNU:     What?

HERNANDEZ:      I mean, that's strange.

CARLOS LNU:     Yeah. Well, it's just that the guy with the ride says that,
                supposedly there was a, a truck following them

29.     Based on my training, experience, and familiarity with the investigation, I believe PEREZ ROJAS was working with ROMERO ANTUNEZ to collect the remaining payment from HERNANDEZ for cocaine.  I also believe that ROMERO ANTUNEZ and PEREZ ROJAS may have detected law enforcement surveillance when they departed 2854 W. 57th Street, which is why PEREZ ROJAS dropped ROMERO ANTUNEZ off at the laundromat for approximately an hour and a half.  Further, I believe this call between CARLOS LNU and HERNADNEZ discussed PEREZ ROJAS and ROMERO ANTUNEZ detecting law enforcement surveillance.  When CARLOS LNU said, "[I]t seems that, like they saw that there were some trucks following them there on the road" and "that he left him at a, a shopping center," I believe he was referring to PEREZ ROJAS detecting surveillance and leaving ROMERO ANTUNEZ at the laundromat.

V.    Further Association of **Subject Premises** with the Drug Trafficking Conspiracy

30.    ROMERO ANTUNEZ's TextNow account intercepted on the wire and described above, (702) 969-0342, was registered at **Subject Premises** using PEREZ ROJAS' Viasat home internet.   Further, between August 16, 2021 and September 28, 2021, the IP addresses associated with the (702) 969-0342 TextNow account resolved to the Viasat account in the name Vicente Perez with service at **Subject Premises** on 189 occasions on 16 different days.   Based on my training, experience, and familiarity with the investigation, I believe ROMERO ANTUNEZ frequently visits **Subject Premises**.

31.    Further, I know that PEREZ ROJAS is frequently at **Subject Premises**.   On September 23, 2021, investigators obtained a search warrant for PEREZ ROJAS' cellular telephone bearing the call number (773) 848-0398.[7]  *In the Matter of the Search of Location information relating to cellular telephone assigned call number (773) 848-0398, with wireless service provider Verizon,* No. 1:21-mj-513 (W.D. Mich. September 23, 2021). A review of the location information for (773) 848-0398 reveals that phone is frequently located in the area of **Subject Premises**. Specifically, during the September 28 money-drop, the location information for (773) 848-0398 mirrored the physical movements of PEREZ ROJAS as viewed by the physical surveillance team.

---

[7]  *See* Footnote 1 above attributing this phone number to PEREZ ROJAS.

32.     On October 14, 2021, another search warrant was issued to TextNow seeking historical messaging content for (772) 771-8490, another "drop" phone used by PEREZ ROJAS.[8] *See In the Matter of the Search of information associated with TextNow Number (772) 771-8490,* No. 1:21-mj-531 (W.D. Mich. October 14, 2021). The content revealed PEREZ ROJAS used (772) 771-8490 for drug trafficking purposes. For instance, on October 14, 2021, at approximately 12:33 a.m. CDT, PEREZ ROJAS, using (772) 771-8490, and ROMERO ANTUNEZ, using (702) 969-0342, had the following text message conversation, which was originally in Spanish and translated to English:

| | |
|---|---|
| PEREZ ROJAS: | One and a half went out |
| PEREZ ROJAS: | But one was short 37 |
| PEREZ ROJAS: | Points |
| ROMERO ANTUNEZ: | I'm working. |
| ROMERO ANTUNEZ: | I reported what you are telling me, but look at the message he sent me. He had not seen it, he wants to pick you up already. |
| ROMERO ANTUNEZ: | "Have you squared everything with 'Guamito'? We agreed he is going to get the ones that belonged to the lady and the restaurant. We need to pick up the 9 from him and have him pay you half." |

_____

[8]  My belief that (772) 771-8490 is used by PEREZ ROJAS is based on toll analysis, including common contacts and usage sequence with other prior PEREZ ROJAS "drop" phones, and subscriber information. This belief was corroborated when I received the messaging content, which included a message thread with (815) 953-3669, used by Angelica CALDERON, the mother of PEREZ ROJAS' son. On October 1, 2021, at approximately 10:28 p.m. CDT, CALDERON sent "Good night Vicente" to (772) 771-8490.

PEREZ ROJAS:          Well, tell him that they are starting to go out

28.    Based on my training, experience, and knowledge of the investigation, I believe this conversation between PEREZ ROJAS and ROMERO ANTUNEZ was regarding PEREZ ROJAS' progress with selling cocaine.  PEREZ ROJAS initially said one and a half kilograms of cocaine was distributed ("One and a half went out"), but that 37 grams were missing from one of the kilograms ("one was short 37 points"). ROMERO ANTUNEZ relayed a message to PEREZ ROJAS from another individual concerning their drug trafficking activity. PEREZ ROJAS told ROMERO ANTUNEZ to let the other individual know that the kilograms of cocaine he previously received are beginning to be sold ("they are starting to go out"). This demonstrates that PEREZ ROJAS and ROMERO ANTUNEZ continue to work together to distribute kilogram quantities of cocaine.

29.    In addition to ROMERO ANTUNEZ, PEREZ ROJAS also had conversations with other contacts regarding coordination of drug exchanges and meetings. For instance, on September 12, 2021, PEREZ ROJAS, using (772) 771-8490, and an unknown person using (206) 880-5759 (hereafter referred to as "UP5759"), had the following text message conversation, which was originally in Spanish and translated to English:

UP5759:          Vicente buddy, I talked with my buddy and it is going to happen, he wants six buckets of paint.

         *                *                *                *

PEREZ ROJAS:     Tell him that there are four on hand.

27

PEREZ ROJAS: There are more due to arrive.

UP5759: Ok.

UP5759: That's fine God willing we'll leave tomorrow. We'll be in touch. Those 4 are already sold.

PEREZ ROJAS: Once here we'll come to an agreement on how we'll do it.

  \*    \*    \*    \*

UP5759: I need you to send me the address to enter it in the GPS.

PEREZ ROJAS: 3 gladiolos st. Momence Illinois 60954.

PEREZ ROJAS: It's a gas station close to the house.

30. Based on my training, experience, and knowledge of the investigation, I believe PEREZ ROJAS and UP5759 were arranging a multi-kilogram cocaine deal to take place near **Subject Premises**. UP5759 requested "Vicente" (PEREZ ROJAS) provide an associate six kilograms of cocaine ("six buckets of paint"). PEREZ ROJAS responded that he had four kilograms on hand, but that more kilograms will be arriving to him soon. UP5759 confirmed that he already has a buyer ready to purchase the available four kilograms ("Those four are already sold"). PEREZ ROJAS later provided the address of 3 Gladiolus Street in Momence, IL, which is approximately nine minutes from **Subject Premises**. PEREZ ROJAS says that address is a "gas station close to the house," which is **Subject Premises**. Further, based on PEREZ ROJAS' instruction to UP5759 to meet up close to **Subject Premises**, I believe he was storing the four kilograms at **Subject Premises**.

31.     Between September 28, 2021 and October 14, 2021, the IP addresses associated with the (772) 771-8490 TextNow account used by PEREZ ROJAS resolved to the Viasat account in the name Vicente Perez with service at **Subject Premises** on 75 occasions on 12 different days.

## GENERAL KNOWLEDGE REGARDING RESIDENCES ASSOCIATED TO DRUG TRAFFICKING AND TECHNICAL TERMS

33.     I know from training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions.  Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates.   Mobile telephones are portable and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement.  Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of narcotics, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time.

34.     I know from training and experience that, to protect against theft, drug traffickers frequently keep firearms and ammunition on or about the premises where they store drugs, currency, or other items of value.  Because drug traffickers cannot report the theft of drugs, drug proceeds, or other items of value to law enforcement

without substantial risk of their illicit activities being discovered, they themselves must "police" areas where drugs are bought, sold, and stored through the possession and use of firearms and other dangerous weapons.

35.    Further, based upon my training, experience, and participation in financial investigative aspects involving large amounts of controlled substances, I am aware of the following:

a.    That to accomplish concealment of evidence of drug trafficking, drug traffickers have built "stash" places within their residences or businesses for various items associated with their drug business.

b.    Drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies.

c.    That even though these assets are in names other than the drug traffickers', the traffickers actually own and continue to use these assets, and exercise dominion and control over them.

d.    That drug traffickers often maintain, on hand, and often in stash locations, large amounts of currency in order to maintain and finance their on-going narcotics business.

e.    That it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned books,

records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including in stash locations.

f.      That it is common for drug traffickers to secrete contraband, proceeds and records of drug transactions in businesses and/or other locations which they maintain dominion and control to ensure ready access to these items and to conceal them from law enforcement authorities; that subjects involved in drug trafficking often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns.  Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from.  Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets.

g.      That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.   This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers.  These and other items are maintained by the drug traffickers within their residences, businesses, or other locations over which they maintain dominion and control.

h. That drug traffickers often utilize electronic equipment such as computers, tablets, and mobile telephones to utilize messaging apps, such as TextNow account used by VICENTE PEREZ ROJAS.

i. That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

j. That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

k. That it is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying increments to facilitate quick counting.

l. That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

m.     That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product.  That these traffickers usually maintain these photographs in their possession and at their place of residence.

n.     That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

## AUTHORIZATION REQUEST

36.     As set forth in this application, investigators believe that ADRIAN ROMERO ANTUNEZ and VICENTE PEREZ ROJAS are actively utilizing the **Subject Premises** to facilitate drug trafficking, store narcotics-related proceeds and paraphernalia associated with narcotics trafficking (and/or narcotics), and to store devices that contain evidence of their involvement in the drug trafficking conspiracy.

37.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

## CONCLUSION

38.    I submit that this application supports probable cause for a warrant to search the **Subject Premises** described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

**s/BEN GLYNN**

BENJAMIN D. GLYNN
Special Agent
Federal Bureau of Investigations

Attested to by reliable electronic means in accordance with Fed. R. Crim. P. 4.1 on October 26, 2021.

**s/ERIC I. LONG**

HON. ERIC I. LONG
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
Premises to be Searched

The property to be searched is 2785 North River Isle Road Momence, Illinois 60954 (**"Subject Premises"**).  **Subject Premises** is described as a two-story, single-family dwelling with blue/gray siding and a detached garage on the northern edge of the property. It is the second to last house on the east side of North River Isle Road before it bends to the west and terminates at the edge of the Kankakee River. A photograph of the **Subject Premises** is shown below:



This application specifically requests authorization to search the house, along with any attached and detached structures, garages, sheds, outbuildings, or vehicles located in the garage of, or within the curtilage of, **Subject Premises**. This Application further requests authorization to employ a K-9, trained in the detection of controlled substances, to assist in the search.

**ATTACHMENT B**
Items to Be Seized

1.  Controlled substances and all paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices.

2.  Paraphernalia for packaging cash drug proceeds including heat sealing devices, plastic packaging for cash, rubber bands, and money counting devices.

3.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances. Photographs of individuals, associates, their property and their drugs. Records reflecting names, nicknames, addresses, and telephone numbers of both current and past drug associates.

4.  Shipping labels or materials, boxes, receipts, or other records indicating use of the U.S. Mail or other courier services.

5.  Books, records, receipts, notes, ledgers, airline tickets, money orders, wire transfer or money remittance records, real estate records, bank statements, and other records related to the receipt, expenditure and concealment or other disposition of income. Mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys and other indications of residency.

6.  Safes, safety deposit boxes, keys for safety deposit boxes, hidden compartments and other secure locations, which often contain the proceeds of drug trafficking activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

7.  Telephone records and telephone devices, including telephones, cellular/mobile/digital telephones, smartphones, digital pagers, voice pagers, and alpha-numeric display pagers.

8.  Desktop computers, notebook computers, and tablets.

9.  Records relating to controlled substances income and expenditures of proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging, in drug trafficking activities.

10. Proceeds of drug trafficking, including United States currency, other currency, precious metals, jewelry, and financial instruments, including certificates of deposit and stock and bonds.

11. Firearms and ammunition.